1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

7

8

9

10

11

12

| | |
|---|---|
| J.J., individually; and AMANDA JACKSON, individually, | CASE NO. C16-5060 BHS |
| Plaintiffs, | ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT |
| v. | |
| OLYMPIA SCHOOL DISTRICT, | |
| Defendant. | |

13    This matter comes before the Court on Olympia School District's ("District")

14 motion for partial summary judgment. Dkt. 16. The Court has considered the pleadings

15 filed in support of and in opposition to the motion and the remainder of the file and

16 hereby grants the motion for the reasons stated herein.

17                                **I. PROCEDURAL HISTORY**

18    On January 22, 2016, Plaintiffs J.J. and Amanda Jackson (collectively,

19 "Plaintiffs") filed a complaint against the District. Dkt. 1. Plaintiffs allege the District

20 failed to protect J.J. from sexualized hazing when he was a high school student. *Id.*

21 Plaintiffs assert claims under 42 U.S.C. § 1983 and Title IX, as well as a state law claim

22 for negligence. *Id.*

1    On June 14, 2016, the District filed a motion for partial summary judgment on

2    Plaintiffs' federal claims as stated in Counts I and II of the complaint. Dkt. 16. On July

3    29, 2016, the parties stipulated to an extension of briefing deadlines on the District's

4    motion to accommodate further discovery. Dkt. 21. On October 31, 2016, Plaintiffs

5    responded. Dkt. 27. On November 11, 2016, the District replied. Dkt. 33.

6                              **II. FACTUAL BACKGROUND**

7    Plaintiffs' claims are based on (1) an ongoing culture of sexual harassment among

8    the male student athletes at Capital High School, (2) sexual harassment suffered by J.J. in

9    2010, and (3) sexual harassment suffered by J.J. in 2012. For the purposes of summary

10   judgment, the following facts are accepted as uncontroverted and construed in the light

11   most favorable to Plaintiffs.

12   **A.    Hazing Culture in Athletic Program**

13   Prior to the events that precipitate this action, and from 2010 to 2012, a "hazing"

14   ritual referred to as "BND" (short for "Boys Next Door") was practiced among male

15   student athletes at Capital High School. The practice consisted of older student athletes

16   attempting to digitally penetrate the anus of a younger athlete. *See* Dkt. 28 at 99.

17   There are numerous examples suggesting that BND was a common practice

18   among student athletes at Capital High School. Unidentified students created a Facebook

19   page where they would threaten other students with BND online. *Id.* at 103. Rumors of

20   "BND" were circulating among the student athletes with some frequency. *See* Dkt. 28 at

21   59, 96, 102–103, 107; Dkt. 28-2 at 29. In at least one instance, BND was inflicted on a

22   student in the Capital High School parking lot, with multiple student witnesses present.

1  *Id.* at 101. However, there is no evidence that, prior to 2012, the behavior was ever

2  reported to a school official.

3  **B.     2010 Harassment at Seaside, Oregon**

4         In 2010, J.J. was invited as an incoming high school student to join the Capital

5  High School basketball team in Seaside, Oregon for the team's annual summer camp.

6  Dkt. 28 at 22. During the camp, the student athletes slept in a barracks near Seaside High

7  School with their respective teams. *Id.* at 23. J.J. played on the "C-team" and slept in a

8  room with his teammates that was separate from "JV" and Varsity students. *Id.* The C-

9  team head coach, Kraig Lathrop, slept in the same room. *Id.*

10        On the second night of the camp, J.J. returned to the room from the shower when

11 he was assaulted by three JV students who pinned him to his bed and attempted to

12 digitally penetrate him. Dkt. 28 at 26–27. J.J. was wearing only a towel at the time. *Id.*

13 During the assault, one of the JV students kissed J.J. on the neck for approximately 30

14 seconds while attempting to digitally penetrate him. *Id.* At some point, another one of the

15 JV students that assaulted J.J. attempted to remove J.J.'s towel. *Id.* In addition to J.J. and

16 the attackers, the room was occupied by ten to twelve other boys who did not come to

17 J.J's aid. Dkt. 28-2 at 41. J.J. repeatedly yelled "stop," "no," and "get off me" at the three

18 older boys. Dkt. 28 at 26.

19        The assault ended when Lathrop entered the room to order "lights out." Dkt. 28 at

20 27. Lathrop states that he did not see the above described sexual harassment when he

21 entered the room. *Id.* at 127. J.J. confirms that Lathrop could not have seen details of the

22 harassment due to the positioning of the boys in the room. *Id.* at 27. Upon entering the

1   room, Lathrop ordered "lights out" and instructed the older boys to return to their

2   assigned dormitory. *Id.* None of the students in the room, including J.J., reported the

3   harassment. *Id.*

4   **C.    2012 Harassment at Western Washington University**

5         In 2012, the Capital High School basketball teams attended another summer camp

6   hosted by Western Washington University. As part of the camp, the coaches attended a

7   dinner sponsored by the University for a portion of an evening while their high school

8   athletes were supervised by the University's basketball players (called "camp

9   counselors") and resident assistants. *See* Dkt. 28 at 50, 52–53, 55, 123.

10        During the coaches' absence, one of Capital High School student athletes

11  suggested that a group of five or six players, including J.J., "go get the freshman." *Id.* at

12  32. J.J. joined the group and went to a room occupied by freshman players, where several

13  of his teammates went inside and began "horseplay" such as wrestling. *Id.* at 33, 61. J.J.

14  did not enter and participate, but stayed at the door and watched while talking with

15  another teammate. *Id.* The older teammates subjected at least one of the freshman players

16  to BND, *see id.* at 50–51, 56–57, 61–62, 64–65, but J.J. did not see it. *Id.* at 33, 61.

17        After J.J. and the older players left the room, they were approached by one of the

18  University's basketball players acting as a camp counselor who had heard the noise of the

19  incident. *Id.* at 33. When the University basketball player asked the group what the noise

20  was, one of the older Capital High School teammates responded, "We were sticking our

21  fingers up the kids' [sic] butt." *Id.* The University basketball player then scolded J.J. and

22  his teammates and informed them that they could no longer engage in such conduct. *Id.*

The group of older Capital High School students then retired to one of their rooms. *Id.* After approximately an hour, the group decided "[l]et's get somebody else." *Id.* at 34. At that point, the group decided they would target J.J. and, while J.J. was pinned face down on a bed, four of J.J.'s teammates tried to digitally penetrate him through his basketball shorts. *Id.*

The following morning, the coaches were informed by the camp counselor of his interaction with J.J. and the other Capital High School teammates. *Id.* at 35, 50. Upon receiving actual notice of the harassment, the coaching staff conducted interviews with their students, cancelled the remainder of the team's participation at camp, reported the matter to District personnel, and then reported it to the Washington State's Child Protective Services and the police. Dkt. 17-8 at 3–4. After an extensive investigation, the District determined that the student athletes had been inadequately supervised at the time of the 2012 incident, thereby leading the District to terminate the head of the Capital High School basketball program, Coach Galloway. *Id.* at 7–8.

### III. DISCUSSION

**A.    Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

1    (1986). There is no genuine issue of fact for trial where the record, taken as a whole,

2    could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec.*

3    *Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) (nonmoving party must

4    present specific, significant probative evidence, not simply "some metaphysical doubt").

5    *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if

6    there is sufficient evidence supporting the claimed factual dispute, requiring a judge or

7    jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc*., 477

8    U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

9    626, 630 (9th Cir. 1987).

10        The determination of the existence of a material fact is often a close question. The

11    Court must consider the substantive evidentiary burden that the nonmoving party must

12    meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477

13    U.S. at 254; *T.W. Elec. Serv., Inc*., 809 F.2d at 630. The Court must resolve any factual

14    issues of controversy in favor of the nonmoving party only when the facts specifically

15    attested by that party contradict facts specifically attested by the moving party. The

16    nonmoving party may not merely state that it will discredit the moving party's evidence

17    at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W.*

18    *Elec. Serv., Inc*., 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory,

19    nonspecific statements in affidavits are not sufficient, and missing facts will not be

20    presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

21

22

**B.     Title IX**

The District moves for summary judgment on Plaintiff's Title IX claims. Title IX states that no person "shall, on the basis of sex, . . . be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has recognized an implied private right of action for damages under this provision. *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 639 (1999). When such actions arise from student-on-student harassment, a plaintiff may recover only by showing (1) deliberate indifference, (2) to sexual harassment, (3) of which the school district has actual knowledge, (4) that is so severe, pervasive, and objectively offensive, (5) that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school. *Ray v. Antioch Unified Sch. Dist.*, 107 F. Supp. 2d 1165, 1169 (N.D. Cal. 2000) (citing *Davis*, 526 U.S. at 650).

Plaintiffs' complaint raises three potential theories of liability under Title IX. First, Plaintiffs suggest that from 2010 to 2012 the District was deliberately indifferent to an ongoing custom of sexual "hazing" in its athletic programs that resulted in the attempted digital penetration of J.J. in 2010 and 2012. Dkt. 1 at 8. Second, Plaintiffs allege that the District inadequately responded to known sexual harassment against J.J. in 2010. *Id.* Third, Plaintiffs' broadly worded complaint suggests that the District inadequately responded to reports of sexual harassment against J.J. in 2012.

1      ## 1.      Hazing Customs from 2010 to 2012

2       "In sexual harassment cases, it is the deliberate failure to curtail known

3      harassment, rather than the harassment itself, that constitutes the intentional Title IX

4      violation." *Mansourian v. Regents of Univ. of California*, 602 F.3d 957, 967 (9th Cir.

5      2010). Some courts have recognized that "in certain circumstances a school's generally

6      inadequate response to a *known* institutional problem of sexual violence can support a

7      student-on-student harassment claim under Title IX." *Karasek v. Regents of the Univ. of*

8      *California*, 15-CV-03717-WHO, 2015 WL 8527338, at *9 (N.D. Cal. Dec. 11, 2015)

9      (emphasis added) (quotation marks omitted).

10             The Supreme Court has "expressly declined to impose liability on 'principles of

11     *respondeat superior* or constructive notice,' instead demanding actual notice to an

12     official of the defendant." *Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir.

13     2006) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285 (1998)). Actual

14     notice requires that the harassment must be brought to the attention of a person "who at a

15     minimum has authority to address the alleged discrimination and to institute corrective

16     measures on the recipient's behalf . . . ." *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d

17     736, 739 (9th Cir. 2000) (quoting *Gebser*, 524 U.S. at 290).

18             Plaintiffs argue that Coach Galloway and District officials were aware of a BND

19     hazing culture in the Capital High School athletic programs. They point to the existence

20     of a Facebook page dedicated to BND and rumors circulating among students of regular

21     BND harassment. *See* Dkt. 28 at 59, 96, 102–103, 107; Dkt. 28-2 at 29. Also, Plaintiffs

22     cite a conversation in which Galloway spoke with student athletes on the basketball team

prior to the 2012 incident at Western Washington University to inform them generally that "hazing" was inappropriate. *See* Dkt. 28 at 59, 102, 104, 114–115.

However, this evidence does not indicate actual notice. There is no evidence that district officials actually viewed or were informed of the Facebook page for BND. Nor is there any evidence showing that the rumors of BND were reported to a person "who at a minimum has authority to address the alleged discrimination and to institute corrective measures . . . ." *Reese*, 208 F.3d at 739. While Galloway addressed his student athletes in order to deter hazing in general prior to a basketball camp where sexual harassment ultimately occurred, there is no indication that Galloway knew about BND in particular or any other instances of sexual harassment among his student athletes.[1] *See* Dkt. 28 at 59, 102, 104, 114–115. Instead, the record suggests only that Galloway was vaguely aware of the general hazing, bullying, and teasing that are unfortunately all too common among adolescents. "Courts . . . must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults." *Davis*, 526 U.S. at 651.

Plaintiffs have provided ample evidence that the school district was placed on constructive notice of a culture of sexual hazing among Capital High School athletes, and therefore, that District employees may have fallen short in their duty to supervise and protect their students. Nonetheless, there is no evidence that (prior to the 2012 camp at

---

[1] During a deposition, one student said that he believed that Galloway was addressing the practice of BND when he addressed the basketball team prior to the WWU camp. Dkt. 28 at 104. However, the student did not provide any basis for this belief and when asked if he knew if any of the coaches were actually aware of BND, he replied, "Not specifically, no." *Id.*

1   Western Washington University) the District received actual notice of a hazing culture in

2   which its student athletes were subjected to the kind of severe sexual harassment upon

3   which Plaintiffs' claim is based.

4          **2.      Deliberate Indifference to Harassment in 2010**

5          In their complaint, Plaintiffs also bring a claim under Title IX for "[t]he Defendant

6   School District's failure to promptly and appropriately respond to the alleged sexual

7   harassment." Dkt. 1 at 8. In their briefing on summary judgment, they argue that the

8   District failed to take proper remedial measures when it "had actual knowledge of J.J.

9   being sexually assaulted in 2010 at the Seaside, OR basketball camp." *Id.* at 14–17.

10         As noted by Judge Wagner of the Eastern District of California, in Title IX

11  damages actions, "the test is whether the appropriate official possessed enough

12  knowledge of the harassment that he or she reasonably could have responded with

13  remedial measures to address the kind of harassment upon which plaintiff's legal claim is

14  based." *Roe ex rel. Callahan*, 678 F. Supp. 2d at 1030. In *Roe ex rel. Callahan*, a coach

15  testified that he had seen a group of football players run across a gymnasium, pin another

16  boy on a mattress by his arms and legs, and then use a battery-powered pump to blow air

17  up the boy's shorts. 678 F. Supp. 2d at 1031. Based on those facts, the court found a

18  genuine factual dispute over the issue of actual knowledge when the coach, having seen

19  an incident of alleged harassment in all its detail, "characterize[d] the incident as

20  horseplay among young men and den[ied] any sexual connotation or connection." *Id.* at

21  1032 (citing *Bordeur*, 626 F. Supp. 2d at 211–12). Summary judgment was therefore

22  denied.

1    In *Brodeur v. Claremont School District*, upon which the analysis in *Roe ex rel.*

2    *Callahan* relied, a high-school teacher with a history of making inappropriate remarks

3    towards young female students made repeated sexual comments towards one of his

4    female chemistry students. 626 F. Supp. 2d at 207. After the student reported these

5    comments to a counselor, the school's principal decided he did not view the comments as

6    sexual harassment, and therefore disregarded the school's formal sexual harassment

7    policy of immediately reporting all allegations of harassment to the superintendent. *Id.*

8    The court found that the student's complaint, which included a written description of the

9    teacher's comments, was sufficient to create a trial-worthy issue as to the district's actual

10   knowledge of sexual harassment. *Id.* at 209.

11   In both *Roe ex rel. Callahan* and *Brodeur*, summary judgment was denied because

12   evidence showed that officials knew of specific acts that could be objectively

13   characterized as sexual in nature, but the officials "did not view the [known conduct] as

14   sexual harassment." *Roe ex rel. Callahan*, 678 F. Supp. 2d at 1032 (quoting *Bordeur*, 626

15   F. Supp. 2d at 211–12).

16   Plaintiffs argue that the District received actual notice of harassment in 2010 when

17   three older students at the Seaside camp attempted to digitally penetrate J.J. in a

18   dormitory room and Coach Lathrop entered the room to order "lights out." Dkt. 28 at 26–

19   27, 60, 62. Plaintiffs rely on the reasoning in *Roe ex rel. Callahan* to argue that genuine

20   factual disputes exist "that J.J.'s assault at Seaside was sexually-motivated and that

21   Coach Lathrop 'possessed enough knowledge of the harassment that [he] reasonably

22   could have responded with remedial measures to address the kind of harassment upon

1   which plaintiff's legal claim is based.'" Dkt. 27 at 16–17 (quoting 678 F. Supp. 2d 1008

2   at 1030). However, the present case is distinguishable from the facts in *Roe ex rel.*

3   *Callahan* or *Brodeur*.

4          When J.J was assaulted in 2010, he had recently showered and was wearing only a

5   towel at the time. Dkt. 28 at 26–27. In addition to J.J. and the attackers, the room was

6   occupied by ten to twelve other boys who did not come to J.J's aid. Dkt. 28-2 at 41.

7   Although J.J. states that he had been yelling "stop," "no," and "get off me" at the three

8   older boys before Lathrop entered the room, Dkt. 28 at 26, Lathrop states that he did not

9   see the above described sexual harassment when he entered room. *Id.* at 127. Most

10  importantly, J.J. confirms that Lathrop could not have seen any details of the harassment

11  due to the positioning of the boys in the room. *Id.* at 27. Upon entering the room, Lathrop

12  ordered "lights out" and instructed the older boys to return to their assigned dormitory,

13  consequently ending any harassment that was taking place. *Id.* There is no evidence that

14  any of the students in the dormitory reported the harassment and J.J. says that he did not

15  tell anyone about the incident. *Id.*

16         Even interpreting this evidence in the light most favorable to Plaintiffs, unlike the

17  school officials in *Roe ex rel. Callahan*, Lathrop did not perceive any specific acts against

18  J.J. that could be regarded as sexual harassment. Unlike the principal in *Brodeur*, Lathrop

19  did not receive reports of the harassment. Even if Lathrop had heard shouts of "stop" and

20  "get off of me" prior to entering the room, such general shouting can be reasonably

21  expected when supervising of any group of children or teenagers. *See Davis*, 526 U.S. at

22  651 ("[C]hildren may regularly interact in a manner that would be unacceptable among

1   adults."). Therefore, unlike in *Roe ex rel. Callahan* and *Brodeur*, Plaintiffs have not

2   created a triable issue as to whether *known acts* could be interpreted as sexually

3   motivated. *See Roe ex rel. Callahan*, 678 F. Supp. 2d at 1032 ("[D]ispute over the sexual

4   nature of the . . . assault precludes an entry of summary judgment in this case.")

5         In essence, Plaintiffs argue that evidence of abundant constructive notice creates a

6   triable issue as to the District's actual notice. The Court declines to adopt this reasoning.

7   The authority Plaintiffs cite does not support such a broad rule for the interpretation of

8   term "actual notice." Instead, Plaintiffs' cited legal authority shows that a triable issue of

9   fact arises when a school official is confronted with *known acts* that could objectively be

10   characterized as sexually motivated, but the official does not view those acts as sexual

11   harassment. *See Roe ex rel. Callahan*, 678 F. Supp. 2d at 1032; *Bordeur*, 626 F. Supp. 2d

12   at 211–12. Plaintiffs have failed to support their Title IX claim with evidence that

13   Lathrop had *actual notice* of the kind of sexual harassment upon which the claim is

14   based.

15       **3.**      **Deliberate Indifference to Harassment in 2012**

16         By broadly alleging that "[t]he Defendant School District[] fail[ed] to promptly

17   and appropriately respond to the alleged sexual harassment," Dkt. 1 at 8, Plaintiffs

18   suggest in their complaint that the District inadequately responded to the harassment

19   against J.J. at the Western Washington University basketball camp in 2012. The record

20   shows that the District received actual notice of harassment in 2012. However, in their

21   opposition to summary judgment, Plaintiffs do not argue that the District is liable for

22   inadequately responding to those reports. *See* Dkt. 27. Therefore, because the complaint

1   is worded so broadly, it is unclear whether Plaintiffs seek recovery under such a theory.

2   Nonetheless, in light of Plaintiffs' broadly worded complaint, the Court finds that a claim

3   based on the District's response to the 2012 reports would necessarily fail. *See Martinez*

4   *v. Stanford*, 323 F.3d 1178, 1182 (9th Cir. 2003) (failure to respond to motion for

5   summary judgment does not relieve moving party from meeting its burden to show that it

6   is entitled to summary judgment).

7          Upon receiving actual notice of the harassment in 2012, the coaching staff

8   cancelled the remainder of the team's participation at camp, reported the matter to

9   District personnel, and then reported it to the Washington State's Child Protective

10  Services and the police. Dkt. 17-8 at 3–4. After an extensive investigation, the District

11  determined that the student athletes had been inadequately supervised at the time of the

12  2012 incident, thereby leading the District to terminate Coach Galloway. *Id.* at 7–8. In

13  light of the remedial measures taken by the District, the Court finds as a matter of law

14  that the response to reports of J.J.'s sexual harassment in 2012 was not clearly

15  unreasonable.

16         **4.    Conclusion on Title IX Claims**

17         The Court has found that Plaintiffs cannot show that the District had actual

18  knowledge of the ongoing BND hazing occurring from 2010 to 2012 among Capital High

19  School's student athletes. Nor can Plaintiffs show that the District received actual notice

20  of J.J.'s harassment in 2010 when Coach Lathrop entered the dormitory to order "lights

21  out." Therefore, the Court must enter summary judgment in favor of the District on these

22

ORDER - 14

1   Title IX claims.[2] Additionally, Plaintiff has failed to respond to the District's argument

2   for summary judgment on claims arising from the District's response to the reports of

3   J.J.'s harassment in 2012. Because the District's response to those reports was not clearly

4   unreasonable, the Court enters summary judgment in favor of the District on this claim.

5   Plaintiffs have no remaining Title IX claims.

6   **C.      42 U.S.C. § 1983**

7           The District also moves for summary judgment on Plaintiffs' claims of municipal

8   liability under 42 U.S.C. § 1983. Dkt. 16 at 17–23. "While local governments may be

9   sued under § 1983, they cannot be held vicariously liable for . . . constitutional

10  violations." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013). To state a

11  claim against a municipality under § 1983, a Plaintiff must allege sufficient facts to

12  support a reasonable inference that the implementation of a policy, custom, or practice

13  was the "moving force" that resulted in the deprivation of his constitutional rights.

14  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–92 (1978).

15          In order to establish municipal liability under 42 U.S.C. § 1983, a plaintiff must

16  first establish an underlying constitutional deprivation. *See Quintanilla v. City of*

17  *Downey*, 84 F.3d 353, 356 (9th Cir. 1996) (no recovery on § 1983 claim against city

18  _____

19          [2] Because the issue of actual notice is dispositive of these claims, the Court need not
    address the District's additional arguments for dismissal. Regardless, the Court will summarily
    note that triable issues of fact exist as to (1) a denial of educational opportunities (*see* Dkt. 28 at
20  38–39; Dkt. 28-2 at 41–43, 45–48), and (2) the severe and pervasive nature of the harassment.
    *See* Dkt. 28 at 26–27, 32–33. The District's argument on deliberate indifference is merely a
21  restatement of its argument on the issue of actual notice. *See* Dkt. 16 at 12–13. The Court does
    not address whether, under Title IX, the issues of actual notice and deliberate indifference are in
22  fact separate, or whether actual notice is merely a development of the deliberate indifference
    standard as applied in the context of Title IX claims.

absent showing that plaintiff's arrest violated his constitutional rights). Plaintiffs argue that the attempted digital penetration of J.J. at the Seaside Basketball Camp in 2010 and at the Western Washington Basketball Camp in 2012 resulted in the deprivation of J.J.'s constitutional rights. Specifically, they argue that the District's failure to protect J.J. from this harassment constituted violations of due process and equal protection.

### 1.    Due Process

"[T]he Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). Therefore, "the Fourteenth Amendment typically 'does not impose a duty on [the state] to protect individuals from third parties.'" *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011) (quoting *Morgan v. Gonzales*, 495 F.3d 1084, 1093 (9th Cir. 2007)). There are, however, two exceptions: (1) the "special-relationship" exception, and (2) the "danger-creation" exception. *Id.* at 971–72.

### a.    Special-Relationship Exception

"The special-relationship exception does not apply when a state fails to protect a person who is not in custody." *Id.* at 972 (citing *Deshaney*, 489 U.S. at 195–202). However, there is limited authority defining the term "custody" within the context of the special-relationship exception. Indeed, both the District and Plaintiffs rely almost exclusively on *Patel* and *Deshaney* in making their arguments. Dkt. 16 at 18–19; Dkt. 27 at 19–20; Dkt. 33 at 8–9. In its reply, the District provides several other citations, ranging from an unpublished district court decision out of Texas to a Utah case addressing special

1  relationships under state negligence law. Dkt. 33 at 9. To the extent that these cases are

2  relevant, they suggest that the special-relationship exception applies only where the

3  "custody" of the plaintiff is involuntary. *See J.D. v. Georgetown Indep. Sch. Dist.*, A-10-

4  CA-717 LY, 2011 WL 2971284, at *6 (W.D. Tex. July 21, 2011) (no special relationship

5  formed by school when supervising a disabled sixth grader during a voluntary field trip);

6  *DeAnzona v. City & Cty. of Denver*, 222 F.3d 1229, 1234 (10th Cir. 2000) ("A plaintiff

7  must show involuntary restraint by the government to have a claim under a special

8  relationship theory."). This involuntariness requirement appears tethered to the Supreme

9  Court's language that a special relationship arises when the Government "takes a person

10 into its custody and *holds him there against his will*," *Deshaney*, 489 U.S. at 199–200

11 (emphasis added), or when it subjects a person to "incarceration, institutionalization, or

12 other *similar* restraint of personal liberty." *Id.* at 200 (emphasis added).

13       It appears that courts have uniformly rejected the proposition that a student's mere

14 attendance in school activities triggers the special-relationship exception. *Patel*, 648 F.3d

15 at 973 (collecting cases). In *Patel*, a disabled female high-school student was being

16 extorted for money by fellow students who also sent her sexually explicit emails. *Id.* at

17 969. After an investigation, the school implemented a special order requiring constant

18 supervision of the female student. *Id.* Upon commencement of the next school year, the

19 school failed to reinstate the special order, despite requests from the student's mother,

20 and the student ultimately had multiple sexual encounters with a fellow disabled student

21 in the school bathroom. *Id.* at 969–70. When the mother argued that the special-

22 relationship exception applied to her daughter, Ninth Circuit concluded that

"[c]ompulsory school attendance and *in loco parentis* status do not create 'custody'" for the purposes of the special-relationship exception. *Id.* at 973.

Nonetheless, Plaintiffs have highlighted notable distinctions between this case and the facts underlying the above mentioned authorities. They do so to argue that this case "involves school activities so far removed from the typical school day that it is much more akin to the 'institutionalized' setting . . . as originally set out in *Deshaney*." Dkt. 27 at 20. Unlike the potential custody-triggering events in the above mentioned cases, the basketball camps in this case were not merely day-time activities or trips where J.J. "went home every night." *Patel*, 648 F.3d at 973. *See also D.R. by L.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1372 (3d Cir. 1992). Instead, Plaintiffs indicate that the basketball camps where J.J. was sexually assaulted were "more than 130 miles away from home" and "[i]n each instance, J.J. was so far away from home that his basic care needs, including food, first aid, and constant supervision were necessarily left with the school's basketball staff." Dkt. 27 at 20. Plaintiffs rely on this distance from home and the extended overnight nature of the camps to argue that the District's supervisory responsibilities during the basketball camps "restrained the child's liberty that the parents [could] not care for the child's basic needs." *Patel*, 648 F.3d at 974.

The Ninth Circuit has viewed the fact that students return home after school each day as an indication that "student[s] remai[n] in the custody of [their] parents, not the school." *Id.* at 974. Central to the Third Circuit's similar reasoning in *D.R. by L.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364 (3d Cir. 1992), was the idea that, unlike inmates or institutionalized persons, students "may turn to persons unrelated

to the state for help on a daily basis" and their "channels for outside communication were

not totally closed." *Id.* at 1372. Therefore, the Third Circuit refused to find a special

relationship when "[t]he state did nothing to restrict [the student's] liberty after school

hours and thus did not deny [the student] meaningful access to sources of help." *Id.*

While Plaintiffs argue that the overnight stays of the basketball camps and J.J.'s

distance from home created restrictions on J.J's liberty, the Court finds that such

circumstances are insufficient as a matter of law to establish the type of custody

contemplated under the special-relationship exception. While J.J. was assigned to certain

sleeping quarters and activities during the camps, his participation in the basketball

program and its overnight camps was voluntary. In fact, it is readily observed that J.J.'s

participation in the Capital High School basketball program is more voluntary than the

compulsory school attendance considered by the Ninth Circuit in *Patel*. Moreover, there

is no evidence that the District took any actions that would close J.J.'s channels for

outside communication or deny him meaningful access to sources of help.

In reaching its decision, the Court does not necessarily rely on the Tenth Circuit's

rule that a plaintiff must show "involuntary restraint" to establish a special relationship.

*See DeAnzona*, 222 F.3d at 1234. Nor does the Court base its decision on a rule that

schools must "totally close" students' channels of communication before a special

relationship can arise. *See D.R. by L.R.*, 972 F.2d at 1372. Instead, the Court has merely

considered the voluntary nature of the basketball camp and J.J.'s continual access to

outside help as determinative that, even while attending the basketball camps, J.J.'s

"freedom was not restrained by [the District] in a manner akin to 'incarceration' or

1   'institutionalization.'" *Patel*, 648 F.3d at 974 (9th Cir. 2011). Therefore, even viewing the

2   facts in the light most favorable to Plaintiffs, the special-relationship exception does not

3   apply in this case.

4            **b.      Danger-Creation Exception**

5        The "danger-creation" exception applies only where there is (1) "affirmative

6   conduct on the part of the state in placing the plaintiff in danger," and (2) "the state acts

7   with 'deliberate indifference' to a 'known or obvious danger.'" *Patel*, 648 F.3d at 974

8   (quoting *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000);

9   *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996)). The Ninth Circuit's "'state-created

10   danger' cases . . . contemplate § 1983 liability for the state actor who, though not

11   inflicting plaintiff's injury himself, has placed plaintiff in the harmful path of a third

12   party not liable under § 1983." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1082 (9th

13   Cir. 2006).

14        In *Johnson v. City of Seattle*, 474 F.3d 634 (9th Cir. 2007), the Ninth Circuit

15   examined cases where it had previously recognized affirmative acts that implicated the

16   danger-creation exception. Examining those cases, the Ninth Circuit noted that it had

17   only found affirmative state actions when there was "involuntary exposure to harm, as a

18   result of a state actor's command," "the state actor exposed the plaintiff to a danger

19   which she otherwise would not have face," or state actors "confine[d] the . . . Plaintiffs to

20   a place where they would be exposed to a risk of harm by private persons." 474 F.3d at

21   640–41. For instance, in *Grubbs*, a medium-security prison assigned a nurse to work

22   unknowingly alongside a dangerous sex offender who had failed all the institution's

treatment programs, despite previous assurances that she would not be required to work alone with violent sex offenders. *See* 974 F.2d 119. In *Penilla*, the danger-creation exception applied when police locked a seriously ill person in his house and cancelled a neighbor's 911 request for emergency services. *Penilla v. City of Huntington Park*, 115 F.3d 707, 710–11 (9th Cir. 1997). In *Munger*, police expelled a belligerent and intoxicated bar patron, wearing only a T-shirt and jeans, into subfreezing temperatures where he died of hypothermia only two blocks away. *Munger*, 227 F.3d at 1084–85. In *Kennedy*, police assured a mother who had reported the molestation of her daughter that they would give her notice prior to contacting the accused neighbor. 439 F.3d at 1057–58. The police failed to provide notice to the mother before contacting the neighbor and, early the next morning, she was shot in her bed while sleeping. *Id.* at 1058. In each of these cases, the government exposed the victim to a risk of harm that was involuntary on the part of the victim. Accordingly, in each of these cases, it could be said that the government "affirmatively created an actual, particularized danger [the plaintiffs] would not otherwise have faced." *Kennedy*, 439 F.3d at 1063.

However, in *Johnson*, the Ninth Circuit concluded that the defendant police officers had not engaged in any affirmative conduct that satisfied the first prong of the danger-creation exception. In that case, the plaintiffs had been assaulted and injured (and one had died) at the hands of a crowd during a Mardi Gras celebration in Seattle's Pioneer Square. 474 F.3d at 637. The plaintiffs alleged that police had been deliberately indifferent to their safety by abandoning an aggressive crowd-control operational plan in favor of a more passive one. *Id.* at 639. Ultimately, the Ninth Circuit concluded that the

1   danger-creation exception did not apply because the plaintiffs "failed to offer evidence

2   that the Defendants engaged in affirmative conduct that enhanced the dangers the . . .

3   Plaintiffs exposed themselves to by participating in the Mardi Gras celebration." *Id.* at

4   641.

5       The District argues that Plaintiff cannot proceed under the danger-creation

6   exception because "there was no predicate 'affirmative act'" by the District and "there

7   was no awareness of any specific risk of sexual assault of J.J. at either basketball camp."

8   Dkt. 33 at 9. In their response, Plaintiffs argue that the District acted affirmatively in

9   2012 when "Galloway and the other capital coaches left J.J. and the other players

10  inadequately supervised at the [2012 Western Washington University basketball] camp."

11  Dkt. 27 at 21–22.

12      First, the Court rejects the District's argument that the danger-creation exception

13  does not apply because it was unaware of a "specific risk of sexual assault." The Ninth

14  Circuit "ha[s] never required that, for a danger to exist, the exact injury inflicted by a

15  third party must have been foreseeable. Instead, the state actor is liable for creating the

16  foreseeable danger of injury given the particular circumstances." 439 F.3d at 1064 n.5.

17  Unlike a claim under Title IX, claims under § 1983 do not require *actual notice* of the

18  type of harm ultimately suffered by a victim. Instead, an action may lie where the

19  government acts in "deliberate indifference to a known, *or so obvious as to imply*

20  *knowledge of*, danger." *Kennedy*, 439 F.3d at 1064 (quotation marks omitted) (emphasis

21  added).

22

1    Nonetheless, the Court also finds that the coaching staff's decision to leave the

2  team temporarily under the supervision of Western Washington University resident

3  assistants and basketball players is not an affirmative government conduct within the

4  meaning of the danger-creation exception. *See* Dkt. 28 at 52–53, 55, 123.

5    As part of the camp hosted by Western Washington University, the coaches

6  attended a social event for a portion of an evening while their high school athletes were

7  supervised by the University's basketball players (called "camp counselors") and resident

8  assistants. *See* Dkt. 28 at 52–53, 55, 123. Unfortunately, while the coaches were at the

9  event, J.J. and at least one other student were subjected to BND.

10    Prior to attending the camp, J.J. and other students were familiar with the pattern

11  of BND harassment in which several of their teammates had engaged. Indeed, J.J. was a

12  previous victim of this harassment at another basketball camp. Nonetheless, the student

13  athletes on the basketball team, including J.J., voluntarily attended the 2012 Western

14  Washington University basketball camp with their teammates.

15    Notably, the harassment J.J. suffered at the Seaside basketball camp in 2010

16  occurred at a time when the students' supervision *was* provided by the coaching staff.

17  Moreover, J.J. and other students were still otherwise exposed to the same harassment

18  from bad-actor peers when they were not attending basketball camps or sport-related

19  activities. *See* Dkt. 28 at 59, 96, 102–103, 107; Dkt. 28-2 at 29.

20    Under these circumstances, there is no evidence that, by relying upon the

21  supervision offered by the University in the form of camp counselors and University

22  resident assistants, the Capital High School coaching staff "affirmatively created an

1   actual, particularized danger [the plaintiffs] would not otherwise have faced." *Kennedy*,

2   439 F.3d at 1063. The Court recognizes that an analysis of this issue is complicated by

3   the fact that the District had assumed a supervisory role over their student athletes, a fact

4   that is missing from Ninth Circuit precedent on the meaning of affirmative government

5   conduct under the danger-creation exception. However, emphasizing this fact would

6   seem to move the analysis out of context of the danger-creation exemption and into the

7   ambit of special-relationship exception already discussed above.

8        Regardless, the Court finds it need not address the seemingly intertwined

9   relationship of the danger-creation and special-relationship exceptions at this time.

10  Instead, the Court simply notes that the supervisory relationship between the District and

11  its student athletes is insufficient to transform Plaintiffs' claims that the District relied on

12  inadequate supervision in the form of camp counselors and University resident assistants,

13  as opposed to coaches, into affirmative conduct that violates due process. J.J. voluntarily

14  placed himself at risk by attending the Western Washington University basketball camp

15  and there is no evidence that the coaches created or enhanced this risk by attending the

16  evening social event.

17        **2.     Equal Protection**

18        "To establish a § 1983 equal protection violation, the plaintiffs must show that the

19  defendants, acting under color of state law, discriminated against them as members of an

20  identifiable class and that the discrimination was intentional." *Flores v. Morgan Hill*

21  *Unified Sch. Dist.*, 324 F.3d 1130, 1134 (9th Cir. 2003). "A long line of Supreme Court

22  cases make clear that the Equal Protection Clause requires proof of discriminatory *intent*

1    or *motive*." *Navarro v. Block*, 72 F.3d 712, 716 (9th Cir.1995) (emphasis in original)

2    (citations omitted).

3          Plaintiffs argue that the District discriminated against J.J. on the basis of his sex

4    because, "[t]here is little doubt that if this same violence had occurred between a male

5    student and a female student, the reaction from the district would have been markedly

6    different." Dkt. 27 at 23. However, Plaintiffs do not offer any explanation on how the

7    treatment J.J. received varied from similar incidents involving female students, if any

8    such incidents exist. In fact, the record lacks any evidence of gender animus or disparate

9    treatment of students who are sexually harassed based on their gender. Absent any such

10   evidence, Plaintiffs' equal protection claim must fail. *See Roe ex rel. Callahan*, 678 F.

11   Supp. 2d at 1023.

12          **3.     Conclusion on 42 U.S.C. § 1983 Claims**

13          Plaintiffs cannot show that the special-relationship or danger-creation exceptions

14   apply in this case. Therefore, the due process clause did not place the District under a

15   constitutional mandate to protect J.J. from the harassment he suffered at the hands of his

16   peers. Also, Plaintiffs have failed to support their equal protection claim with any

17   evidence of gender animus or disparate treatment of similarly situated female students.

18   Accordingly, the Court must enter summary judgment in favor of the District on

19   Plaintiffs' claims under 42 U.S.C. § 1983.

20   **D.     Supplemental Jurisdiction**

21          The Court also considers *sua sponte* whether it should exercise supplemental

22   jurisdiction over Plaintiffs' remaining claim for negligence under state law. *See Sikhs for*

1   *Justice "SFJ," Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1096 (N.D. Cal. 2015)

2   ("[W]here a district court has dismissed all claims over which it has original jurisdiction,

3   it may *sua sponte* decline to exercise supplemental jurisdiction over remaining state law

4   claims.") (quotation omitted). 28 U.S.C. § 1367(c) provides that:

5           (c) The district courts may decline to exercise supplemental
        jurisdiction over a claim under subsection (a) if-
6               (1) the claim raises a novel or complex issue of State law,
                (2) the claim substantially predominates over the claim or
7       claims over which the district court has original jurisdiction,
                (3) *the district court has dismissed all claims over which it
8       has original jurisdiction*, or
                (4) in exceptional circumstances, there are other compelling
9       reasons for declining jurisdiction.

10  28 U.S.C. § 1367 (emphasis added).

11      "[E]xercising discretion and deciding whether to decline, or to retain,

12  supplemental jurisdiction over state law claims when any factor in0 subdivision (c) is

13  implicated is a responsibility that district courts are duty-bound to take seriously." *Acri v.*

14  *Varian Associates, Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997), *supplemented*, 121 F.3d 714

15  (9th Cir. 1997), *as amended* (Oct. 1, 1997). "If the federal claims are dismissed before

16  trial, the state law claims 'should' be dismissed." *Grant v. Alperovich*, 993 F. Supp. 2d

17  1356, 1366 (W.D. Wash. 2014) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715,

18  726 (1966)). *See also Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988).

19      The Court has dismissed all of Plaintiffs' federal claims, as explained above. This

20  alone provides the Court with reason to decline supplemental jurisdiction over the

21  remaining state law negligence claim. Further, Plaintiffs' remaining negligence claim

22  implicates Washington State's "*in loco parentis*" doctrine which, in the context of

1   overnight extracurricular trips supervised by school officials, may present a novel issue

2   best reserved for the courts of Washington State. The Court does not find that any

3   consideration of convenience to the parties weighs in favor of exercising supplemental

4   jurisdiction. Trial is still approximately five months away and the parties have already

5   completed most of the necessary discovery during a previous state court proceeding.

6   Therefore, the Court declines to exercise supplemental jurisdiction over Plaintiffs'

7   remaining negligence claim.

## IV. ORDER

9       Therefore, it is hereby **ORDERED** that the District's motion for summary

10  judgment (Dkt. 16) on Plaintiffs' Title IX and 42 U.S.C. § 1983 claims is **GRANTED** as

11  stated herein. Further, Plaintiffs' remaining negligence claim is **DISMISSED without**

12  **prejudice**.

13      Dated this 24th day of January, 2017.

14

15  _____

16  BENJAMIN H. SETTLE
    United States District Judge

17

18

19

20

21

22